UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


TERESA TAMELLEO FKA TERESA AGLIONE

     Vs

PHH MORTGAGE CORPORATION
US BANK NATIONAL ASSOCIATION AS
TRUSTEE FOR STRUCTURED ASSET INVESTMENT
LOAN TRUST MORTGAGE PASS THROUGH
CERTIFICATES, SERIES 2004-7


## COMPLAINT

Plaintiff, by her attorney, complains of Defendants as follows:

1.    1.    Plaintiff, Teresa Tamelleo f/k/a Teresa Aglione is a resident of the State of Rhode Island with an address of 9 Lee Ann Drive, Johnston RI 02919. She resides at and owns this real estate along with her husband Joseph Tamelleo. She is the former spouse of Albert Aglione.

2.    Albert Aglione  executed a  promissory note to Option One Mortgage Corporation on April 2, 2004.  A copy of the promissory note is attached as Exhibit A.

4.    As security for this note Plaintiff along with Albert Aglione executed a  mortgage to Option One Mortgage Corporation on April 2, 2004.    A copy of the mortgage is attached as Exhibit B.

5.    US Bank National Association as trustee for Structured Asset Investment Loan Trust. Mortgage Pass-Through Certificates, Series, 2004-7 "US Bank") claims to own Plaintiff's mortgage and the note.

6.    PHH Mortgage Corporation("PHH") is a Delaware Corporation.

7.    PHH  is a debt collector and  is the loan servicer and agent for US Bank.

8.    This Court has jurisdiction due to Diversity Jurisdiction as to US Bank and pursuant to the Fair Debt Collection Act and the Real Estate Settlement and Procedures Act as to PHH.

9.    The primary business of PHH is the collection of debts.

10.    PHH regularly collects debts for mortgagees and other entities.

11.    When PHH commenced servicing of this mortgage loan, the mortgage loan was delinquent.

12.    When Ocwen Loan Servicing, LLC ("Ocwen") commenced servicing of Plaintiff's mortgage loan, the mortgage loan was delinquent.

13.    Ocwen merged with PHH so that PHH became the surviving entity, which serviced the Plaintiff's  loan.

14.    Orlans PC ("Orlans") on May 30, 2023 scheduled a foreclosure sale for Plaintiff's home on   October 18, 2023 at 1:00 PM, pursuant to R.I.G.L. 34-27-4.

15.    A copy of this notice of sale is attached as Exhibit D.

16.    This Notice claims that the foreclosure sale will occur pursuant to power of sale and by entry.

17.    No person signed this Notice on behalf of either Orlans or US Bank.

18.    This Notice of Sale was not mailed by certified mail return receipt requested to 9 Lee Ann Drive, Johnston RI 02919.

19.    Instead it was mailed to the home address of Albert Aglione, which was not 7 Lee Ann Drive, Johnston, RI 02919.

20.    A   Notice of Foreclosure Counseling was not provided to  Plaintiff at her home address in conjunction with this purported foreclosure sale, pursuant to R.I.G.L. § 34-27-3.1 at least 45 days prior to this initiation of the foreclosure sale on May 30, 2023. A notice was purportedly mailed prior to and  in conjunction with a prior Notice of Sale.

21.     R.I.G.L § 34-27-3.1 states:

§ 34-27-3.1. Foreclosure counseling.

(a) No less than forty-five (45) days prior to initiating **any** foreclosure of real estate pursuant to subsection 34-27-4(b), the mortgagee shall provide to an individual consumer mortgagor written notice of default and the mortgagee's right to foreclose by first class mail at the address of the real estate and, if

different, at the address designated by the mortgagor by written notice to the mortgagee as the mortgagor's address for receipt of notices.

(b) The written notice required by this section shall be in English and Spanish and, provided the same is then available, shall advise the mortgagor of the availability of counseling through HUD-approved mortgage counseling agencies and, the toll-free telephone number and website address maintained to provide information regarding no-cost HUD-approved mortgage counseling agencies in Rhode Island. The written notice may also contain any other information required under federal law. A form of written notice meeting the requirements of this section shall be promulgated by the department of business regulation for use by mortgagees at least thirty (30) days prior to the effective date of this section. Counseling shall be provided at no cost to the mortgagee.

(c) Failure of the mortgagee to provide notice to the mortgagor as provided herein shall render the foreclosure void, without limitation of the right of the mortgagee thereafter to reexercise its power of sale or other means of foreclosure upon compliance with this section. The mortgagee shall include in the foreclosure deed an affidavit of compliance with this section.

(d) As used herein and in this chapter, the term "HUD" means the United States Department of Housing and Urban Development and any successor to such department.

22.      The statute provides that failure to provide Plaintiff  this notice  at least forty five days before initiating any foreclosure by mailing a  Notice of Sale will render the sale void.

23.      The failure of US Bank to strictly comply with the terms of the note and mortgage and R.I.G.L 34-27-3.1 will render void any attempt to commence the alleged foreclosure by Statutory Power of Sale, without having the contractual or statutory ability to conduct this foreclosure.

24.      The failure of US Bank and PHH to comply with the terms of the mortgage and note and R.I.G.L 34-27-3.1 renders void any attempt to commence the alleged foreclosure by Statutory Power of Sale, without having the statutory ability or the contractual ability  to exercise the statutory power of sale. Any time a Notice of Sale is mailed to a mortgagor, the mortgagor or the servicer acting on its behalf must mail the consumer a new Notice of Foreclosure Counseling. A prior Notice pursuant to R.I.G.L 34-27-3.1 in conjunction with a prior notice of sale will not comply with the statute.

25.      Plaintiff lives in this property, as her principal residence.

26.     This property is worth at least $450,000.00 and Plaintiff has more than $200,000.00 in equity in this property.

27.     On July 3, 2023, PHH on behalf of US Bank mailed the Albert Aglione, the Plaintiff's ex-husband a Streamlined Loan Modification offer.

28.     A copy of this offer is attached as  Exhibit F.

29.     This streamlined loan modification promised that if Plaintiff made three trial payments of $1233.46 for August, 2023, September, 2023 and October, 2023, her loan would be modified with a monthly payment of $1233.46, including principal, interest and escrow.

30.     Albert Aglione, on behalf of Teresa Aglione accepted this offer and on July 26, 2023 faxed over the acceptance of the modification offer to PHH.

31.     PHH received this offer by fax on July 26, 2023.

32.     On July 31, 2023, Plaintiff made the first modification trial payment for August 1, 2023 by phone payment to PHH.

33.     This payment was withdrawn from Plaintiff's bank account and paid to PHH as indicated by Exhibit G.

34.     In addition to taking this payment, PHH charged the Plaintiff $7.50 for phone pay, which PHH charges its customers, when a payment is made electronically.

34.     On August 31, 2023 Plaintiff made the second  modification trial payment for September 1, 2023 by phone payment to PHH.

35.     This payment was withdrawn from Plaintiff's bank account and paid to PHH as indicated by Exhibit H.

36.     In addition to taking this payment, PHH charged the Plaintiff $7.50 for phone pay, which PHH charges its customers, when a payment is made electronically.

37.     Despite the Streamlined Trial Modification offer of July 3, 2023, PHH, through its attorney continued advertising the sale after June 26, 2023 every week . However under R.I.G.L. 34-11-22 a sale cannot be continued, but must be adjourned.

38.     A copy of the Providence Journal advertisements for a continued (not adjourned)  sale are attached as Exhibit H.

39.     As indicated by Exhibit H,  PHH advertised the continuance of the sale on the following dates after PHH offered the consumer the Trial Modification:

July 11, 2023
July 19, 2023
July 26, 2023

40.     As indicated by Exhibit H, PHH advertised the continuance of the sale on the following dates after  acceptance by Albert Aglione  accepted the

Trial Modification  offer on behalf of Teresa Aglione and PHH received

the first trial payment of $1233.42 on July 31, 2023:

August 2, 2023
August 9, 2023
August 16, 2023
August 23, 2023
August 27, 2023

42.     As indicated by Exhibit H,  PHH advertised the continuance of the

sale on the following dates after Albert Aglione accepted the Trial

Modification  offer on behalf of Teresa Aglione and PHH received the

second  trial payment of $1233.42 on August 31, 2023.

September 6, 2023
September 13, 2023
September 20, 2023
September 27, 2023
October 4, 2023
October 11, 2023

43.     When Plaintiff sought to make the third trial modification at the end

of September, 2023, PHH refused to accept the payment electronically.

44.     Plaintiff called PHH and was advised that the loan was in foreclosure

and that the payment would not be accepted and that she should call Orlans,

PC.

45.     The Plaintiff had not signed the promissory note at the closing.

46.     However PHH confirmed by writing to her  that she was the

confirmed successor in interest to Albert Aglione, the original borrower.

47.    The Consumer Financial Protection Bureau has promulgated a Loss

Mitigation portion of Regulation X, at  12 CFR 1024.41

### § 1024.41 Loss mitigation procedures.

**(a) *Enforcement and limitations.*** A borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f)). Nothing in § 1024.41 imposes a duty on a servicer to provide any borrower with any specific loss mitigation option. Nothing in § 1024.41 should be construed to create a right for a borrower to enforce the terms of any agreement between a servicer and the owner or assignee of a mortgage loan, including with respect to the evaluation for, or offer of, any loss mitigation option or to eliminate any such right that may exist pursuant to applicable law.

**(b) *Receipt of a loss mitigation application*—**(1) *Complete loss mitigation application.* A complete loss mitigation application means an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower. A servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application.

**(2) *Review of loss mitigation application submission*—**(i) *Requirements.* If a servicer receives a loss mitigation application 45 days or more before a foreclosure sale, a servicer shall:

**(A)** Promptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete; and

**(B)** Notify the borrower in writing within 5 days (excluding legal public holi days, Satur days, and Sun days) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete. If a loss mitigation application is incomplete, the notice shall state the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable date pursuant to paragraph (b)(2)(ii) of this section. The notice to the borrower shall include a statement that the borrower should consider contacting servicers of any

other mortgage loans secured by the same property to discuss available loss mitigation options.

(ii) *Time period disclosure.* The notice required pursuant to paragraph (b)(2)(i)(B) of this section must include a reasonable date by which the borrower should submit the documents and information necessary to make the loss mitigation application complete.

(3) *Determining protections.* To the extent a determination of whether protections under this section apply to a borrower is made on the basis of the number of days between when a complete loss mitigation application is received and when a foreclosure sale occurs, such determination shall be made as of the date a complete loss mitigation application is received.

(c) *Evaluation of loss mitigation applications*—(1) *Complete loss mitigation application.* Except as provided in paragraph (c)(4)(ii) of this section, if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application, a servicer shall:

(i) Evaluate the borrower for all loss mitigation options available to the borrower; and

(ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.

(2) *Incomplete loss mitigation application evaluation*—(i) *In general.* Except as set forth in paragraphs (c)(2)(ii), (iii), (v), and (vi) of this section, a servicer shall not evade the requirement to evaluate a complete loss mitigation application for all loss mitigation options available to the borrower by offering a loss mitigation option based upon an evaluation of any information provided by a borrower in connection with an incomplete loss mitigation application.

10

**(ii)** *Reasonable time.* Notwithstanding paragraph (c)(2)(i) of this section, if a <u>servicer</u> has exercised reasonable diligence in obtaining documents and information to complete a <u>loss mitigation application</u>, but a <u>loss mitigation application</u> remains incomplete for a significant period of time under the circumstances without further progress by a borrower to make the <u>loss mitigation application</u> complete, a <u>servicer</u> may, in its discretion, evaluate an incomplete <u>loss mitigation application</u> and offer a borrower a <u>loss mitigation option</u>. Any such evaluation and offer is not subject to the requirements of this section and shall not constitute an evaluation of a single complete <u>loss mitigation application</u> for purposes of paragraph (i) of this section.

**(iii)** *Short-term loss mitigation options.* Notwithstanding paragraph (c)(2)(i) of this section, a <u>servicer</u> may offer a short-term payment forbearance program or a short-term repayment plan to a borrower based upon an evaluation of an incomplete <u>loss mitigation application</u>. Promptly after offering a payment forbearance program or a repayment plan under this paragraph (c)(2)(iii), unless the borrower has rejected the offer, the <u>servicer</u> must provide the borrower a written notice stating the specific payment terms and duration of the program or plan, that the <u>servicer</u> offered the program or plan based on an evaluation of an incomplete <u>application</u>, that other <u>loss mitigation options</u> may be available, and that the borrower has the option to submit a complete <u>loss mitigation application</u> to receive an evaluation for all <u>loss mitigation options</u> available to the borrower regardless of whether the borrower accepts the program or plan. A <u>servicer</u> shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, and shall not move for foreclosure judgment or order of sale or conduct a foreclosure sale, if a borrower is performing pursuant to the terms of a payment forbearance program or repayment plan offered pursuant to this paragraph (c)(2)(iii). A <u>servicer</u> may offer a short-term payment forbearance program in conjunction with a short-term repayment plan pursuant to this paragraph (c)(2)(iii).

**(iv)** *Facially complete application.* A <u>loss mitigation application</u> shall be considered facially complete when a borrower submits all the missing documents and information as <u>stated</u> in the notice required under <u>paragraph (b)(2)(i)(B)</u> of this section, when no additional information is requested in such notice, or once the <u>servicer</u> is required to provide the borrower a written notice pursuant to <u>paragraph (c)(3)(i)</u> of this section. If the <u>servicer</u> later discovers that additional information or

corrections to a previously submitted document are required to complete the application, the servicer must promptly request the missing information or corrected documents and treat the application as complete for the purposes of paragraphs (f)(2) and (g) of this section until the borrower is given a reasonable opportunity to complete the application. If the borrower completes the application within this period, the application shall be considered complete as of the date it first became facially complete, for the purposes of paragraphs (d), (e), (f)(2), (g), and (h) of this section, and as of the date the application was actually complete for the purposes of this paragraph (c). A servicer that complies with this paragraph (c)(2)(iv) will be deemed to have fulfilled its obligation to provide an accurate notice under paragraph (b)(2)(i)(B) of this section.

**(v)** *Certain COVID–19-related loss mitigation options.*

**(A)** Notwithstanding paragraph (c)(2)(i) of this section, a servicer may offer a borrower a loss mitigation option based upon evaluation of an incomplete application, provided that all of the following criteria are met:

*(1)* The loss mitigation option permits the borrower to delay paying covered amounts until the mortgage loan is refinanced, the mortgaged property is sold, the term of the mortgage loan ends, or, for a mortgage loan insured by the Federal Housing Administration, the mortgage insurance terminates. For purposes of this paragraph (c)(2)(v)(A)(*1*), "covered amounts" includes, without limitation, all principal and interest payments forborne under a payment forbearance program made available to borrowers experiencing a COVID–19-related hardship, including a payment forbearance program made pursuant to the Coronavirus Economic Stabilization Act, section 4022 (15 U.S.C. 9056); it also includes, without limitation, all other principal and interest payments that are due and unpaid by a borrower experiencing a COVID–19-related hardship. For purposes of this paragraph (c)(2)(v)(A)(*1*), "the term of the mortgage loan" means the term of the mortgage loan according to the obligation between the parties in effect when the borrower is offered the loss mitigation option.

*(2)* Any amounts that the borrower may delay paying as described in paragraph (c)(2)(v)(A)(*1*) of this section do not accrue interest; the servicer does not charge any fee in connection with the loss mitigation option; and the servicer waives all existing late charges,

penalties, stop payment fees, or similar charges promptly upon the borrower's acceptance of the loss mitigation option.

*(3)* The borrower's acceptance of an offer made pursuant to paragraph (c)(2)(v)(A) of this section ends any pre-existing delinquency on the mortgage loan.

**(B)** Once the borrower accepts an offer made pursuant to paragraph (c)(2)(v)(A) of this section, the servicer is not required to comply with paragraph (b)(1) or (2) of this section with regard to any loss mitigation application the borrower submitted prior to the servicer's offer of the loss mitigation option described in paragraph (c)(2)(v)(A) of this section.

**(vi)** *Certain COVID–19-related loan modification options.*

**(A)** Notwithstanding paragraph (c)(2)(i) of this section, a servicer may offer a borrower a loan modification based upon evaluation of an incomplete application, provided that all of the following criteria are met:

*(1)* The loan modification extends the term of the loan by no more than 480 months from the date the loan modification is effective and, for the entire modified term, does not cause the borrower's monthly required principal and interest payment to increase beyond the monthly principal and interest payment required prior to the loan modification.

*(2)* If the loan modification permits the borrower to delay paying certain amounts until the mortgage loan is refinanced, the mortgaged property is sold, the loan modification matures, or, for a mortgage loan insured by the Federal Housing Administration, the mortgage insurance terminates, those amounts do not accrue interest.

*(3)* The loan modification is made available to borrowers experiencing a COVID–19-related hardship.

*(4)* Either the borrower's acceptance of an offer pursuant to this paragraph (c)(2)(vi)(A) ends any preexisting delinquency on the mortgage loan or the loan modification offered pursuant to this paragraph (c)(2)(vi)(A) is designed to end any preexisting delinquency on the mortgage loan upon the borrower satisfying the servicer's requirements for completing a trial loan modification plan and accepting a permanent loan modification.

*(5)* The servicer does not charge any fee in connection with the loan modification, and the servicer waives all existing late charges, penalties, stop payment fees, or similar charges that were incurred on or after March 1, 2020, promptly upon the borrower's acceptance of the loan modification.

**(B)** Once the borrower accepts an offer made pursuant to paragraph (c)(2)(vi)(A) of this section, the servicer is not required to comply with paragraph (b)(1) or (2) of this section with regard to any loss mitigation application the borrower submitted prior to the servicer's offer of the loan modification described in paragraph (c)(2)(vi)(A) of this section. However, if the borrower fails to perform under a trial loan modification plan offered pursuant to paragraph (c)(2)(vi)(A) of this section or requests further assistance, the servicer must immediately resume reasonable diligence efforts as required under paragraph (b)(1) of this section with regard to any loss mitigation application the borrower submitted prior to the servicer's offer of the trial loan modification plan and must provide the borrower with the notice required by paragraph (b)(2)(i)(B) of this section with regard to the most recent loss mitigation application the borrower submitted prior to the servicer's offer of the loan modification described in paragraph (c)(2)(vi)(A) of this section, unless the servicer has already provided such notice to the borrower.

**(3)** *Notice of complete application.*

**(i)** Except as provided in paragraph (c)(3)(ii) of this section, within 5 days (excluding legal public holi days, Satur days, and Sun days) after receiving a borrower's complete loss mitigation application, a servicer shall provide the borrower a written notice that sets forth the following information:

**(A)** That the loss mitigation application is complete;

**(B)** The date the servicer received the complete application;

**(C)** That the servicer expects to complete its evaluation within 30 days of the date it received the complete application;

**(D)** That the borrower is entitled to certain foreclosure protections because the servicer has received the complete application, and, as applicable, either:

*(1)* If the servicer has not made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process,

that the servicer cannot make the first notice or filing required to commence or initiate the foreclosure process under applicable law before evaluating the borrower's complete application; or

*(2)* If the servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, that the servicer has begun the foreclosure process, and that the servicer cannot conduct a foreclosure sale before evaluating the borrower's complete application;

**(E)** That the servicer may need additional information at a later date to evaluate the application, in which case the servicer will request that information from the borrower and give the borrower a reasonable opportunity to submit it, the evaluation process may take longer, and the foreclosure protections could end if the servicer does not receive the information as requested; and

**(F)** That the borrower may be entitled to additional protections under State or Federal law.

**(ii)** A servicer is not required to provide a notice pursuant to paragraph (c)(3)(i) of this section if:

**(A)** The servicer has already provided the borrower a notice under paragraph (b)(2)(i)(B) of this section informing the borrower that the application is complete and the servicer has not subsequently requested additional information or a corrected version of a previously submitted document from the borrower pursuant to paragraph (c)(2)(iv) of this section;

**(B)** The application was not complete or facially complete more than 37 days before a foreclosure sale; or

**(C)** The servicer has already provided the borrower a notice regarding the application under paragraph (c)(1)(ii) of this section.

**(4)** *Information not in the borrower's control*—(i) *Reasonable diligence.* If a servicer requires documents or information not in the borrower's control to determine which loss mitigation options, if any, it will offer to the borrower, the servicer must exercise reasonable diligence in obtaining such documents or information.

**(ii)** *Effect in case of delay.* (A)*(1)* Except as provided in paragraph (c)(4)(ii)(A)*(2)* of this section, a servicer must not deny a complete loss

mitigation application solely because the servicer lacks required documents or information not in the borrower's control.

> *(2)* If a servicer has exercised reasonable diligence to obtain required documents or information from a party other than the borrower or the servicer, but the servicer has been unable to obtain such documents or information for a significant period of time following the 30-day period identified in paragraph (c)(1) of this section, and the servicer, in accordance with applicable requirements established by the owner or assignee of the borrower's mortgage loan, is unable to determine which loss mitigation options, if any, it will offer the borrower without such documents or information, the servicer may deny the application and provide the borrower with a written notice in accordance with paragraph (c)(1)(ii) of this section. When providing the written notice in accordance with paragraph (c)(1)(ii) of this section, the servicer must also provide the borrower with a copy of the written notice required by paragraph (c)(4)(ii)(B) of this section.

**(B)** If a servicer is unable to make a determination within the 30-day period identified in paragraph (c)(1) of this section as to which loss mitigation options, if any, it will offer to the borrower because the servicer lacks required documents or information from a party other than the borrower or the servicer, the servicer must, within such 30-day period or promptly thereafter, provide the borrower a written notice, informing the borrower:

> *(1)* That the servicer has not received documents or information not in the borrower's control that the servicer requires to determine which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage;

> *(2)* Of the specific documents or information that the servicer lacks;

> *(3)* That the servicer has requested such documents or information; and

> *(4)* That the servicer will complete its evaluation of the borrower for all available loss mitigation options promptly upon receiving the documents or information.

**(C)** If a servicer must provide a notice required by paragraph (c)(4)(ii)(B) of this section, the servicer must not provide the borrower a written notice pursuant to paragraph (c)(1)(ii) of this section until

the servicer receives the required documents or information referenced in paragraph (c)(4)(ii)(B)(*2*) of this section, except as provided in paragraph (c)(4)(ii)(A)(*2*) of this section. Upon receiving such required documents or information, the servicer must promptly provide the borrower with the written notice pursuant to paragraph (c)(1)(ii) of this section.

**(d)** *Denial of loan modification options.* If a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to the borrower pursuant to paragraph (c) of this section, a servicer shall state in the notice sent to the borrower pursuant to paragraph (c)(1)(ii) of this section the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification option and, if applicable, that the borrower was not evaluated on other criteria.

**(e)** *Borrower response*—(1) *In general.* Subject to paragraphs (e)(2)(ii) and (iii) of this section, if a complete loss mitigation application is received 90 days or more before a foreclosure sale, a servicer may require that a borrower accept or reject an offer of a loss mitigation option no earlier than 14 days after the servicer provides the offer of a loss mitigation option to the borrower. If a complete loss mitigation application is received less than 90 days before a foreclosure sale, but more than 37 days before a foreclosure sale, a servicer may require that a borrower accept or reject an offer of a loss mitigation option no earlier than 7 days after the servicer provides the offer of a loss mitigation option to the borrower.

**(2)** *Rejection*—(i) *In general.* Except as set forth in paragraphs (e)(2)(ii) and (iii) of this section, a servicer may deem a borrower that has not accepted an offer of a loss mitigation option within the deadline established pursuant to paragraph (e)(1) of this section to have rejected the offer of a loss mitigation option.

**(ii)** *Trial Loan Modification Plan.* A borrower who does not satisfy the servicer's requirements for accepting a trial loan modification plan, but submits the payments that would be owed pursuant to any such plan within the deadline established pursuant to paragraph (e)(1) of this section, shall be provided a reasonable period of time to fulfill any remaining requirements of the servicer for acceptance of the trial loan modification plan beyond the deadline established pursuant to paragraph (e)(1) of this section.

**(iii)** *Interaction with appeal process.* If a borrower makes an appeal pursuant to paragraph (h) of this section, the borrower's deadline for accepting a loss mitigation option offered pursuant to paragraph (c)(1)(ii) of this section shall be extended until 14 days after the servicer provides the notice required pursuant to paragraph (h)(4) of this section.

**(f)** *Prohibition on foreclosure referral*—(1) *Pre-foreclosure review period.* A servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:

**(i)** A borrower's mortgage loan obligation is more than 120 days delinquent;

**(ii)** The foreclosure is based on a borrower's violation of a due-on-sale clause; or

**(iii)** The servicer is joining the foreclosure action of a superior or subordinate lienholder.

**(2)** *Application received before foreclosure referral.* If a borrower submits a complete loss mitigation application during the pre-foreclosure review period set forth in paragraph (f)(1) of this section or before a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, a servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:

**(i)** The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;

**(ii)** The borrower rejects all loss mitigation options offered by the servicer; or

**(iii)** The borrower fails to perform under an agreement on a loss mitigation option.

**(3)** *Temporary Special COVID–19 Loss Mitigation Procedural Safeguards*—(i) *In general.* To give a borrower a meaningful opportunity to pursue loss mitigation options, a servicer must ensure that one of the procedural safeguards described in paragraph (f)(3)(ii) of this section has been met before making the first notice or filing required by applicable law

for any judicial or non-judicial foreclosure process because of a delinquency under paragraph (f)(1)(i) if:

(A) The borrower's mortgage loan obligation became more than 120 days delinquent on or after March 1, 2020; and

(B) The statute of limitations applicable to the foreclosure action being taken in the laws of the State where the property securing the mortgage loan is located expires on or after January 1, 2022.

(ii) *Procedural safeguards.* A procedural safeguard is met if:

(A) *Complete loss mitigation application evaluated.* The borrower submitted a complete loss mitigation application, remained delinquent at all times since submitting the application, and paragraph (f)(2) of this section permitted the servicer to make the first notice or filing required for foreclosure;

(B) *Abandoned property.* The property securing the mortgage loan is abandoned according to the laws of the State or municipality where the property is located when the servicer makes the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process; or

(C) *Unresponsive borrower.* The servicer did not receive any communications from the borrower for at least 90 days before the servicer makes the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process and all of the following conditions are met:

(1) The servicer made good faith efforts to establish live contact with the borrower after each payment due date, as required by § 1024.39(a), during the 90-day period before the servicer makes the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process;

(2) The servicer sent the written notice required by § 1024.39(b) at least 10 days and no more than 45 days before the servicer makes the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process;

(3) The servicer sent all notices required by this section, as applicable, during the 90-day period before the servicer makes the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process; and

*(4)* The borrower's forbearance program, if applicable, ended at least 30 days before the servicer makes the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process.

**(iii)** *Sunset date.* This paragraph (f)(3) does not apply if a servicer makes the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process on or after January 1, 2022.

**(g)** *Prohibition on foreclosure sale.* If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless:

**(1)** The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;

**(2)** The borrower rejects all loss mitigation options offered by the servicer; or

**(3)** The borrower fails to perform under an agreement on a loss mitigation option.

**(h)** *Appeal process*—(1) *Appeal process required for loan modification denials.* If a servicer receives a complete loss mitigation application 90 days or more before a foreclosure sale or during the period set forth in paragraph (f) of this section, a servicer shall permit a borrower to appeal the servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program available to the borrower.

**(2)** *Deadlines.* A servicer shall permit a borrower to make an appeal within 14 days after the servicer provides the offer of a loss mitigation option to the borrower pursuant to paragraph (c)(1)(ii) of this section.

**(3)** *Independent evaluation.* An appeal shall be reviewed by different personnel than those responsible for evaluating the borrower's complete loss mitigation application.

**(4)** *Appeal determination.* Within 30 days of a borrower making an appeal, the servicer shall provide a notice to the borrower stating the servicer's determination of whether the servicer will offer the borrower a loss mitigation option based upon the appeal and, if applicable, how long the borrower has to accept or reject such an offer or a prior offer of a loss mitigation option. A servicer may require that a borrower accept or reject an offer of a loss mitigation option after an appeal no earlier than 14 days after the servicer provides the notice to a borrower. A servicer's determination under this paragraph is not subject to any further appeal.

**(i)** *Duplicative requests.* A servicer must comply with the requirements of this section for a borrower's loss mitigation application, unless the servicer has previously complied with the requirements of this section for a complete loss mitigation application submitted by the borrower and the borrower has been delinquent at all times since submitting the prior complete application.

**(j)** *Small servicer requirements.* A small servicer shall be subject to the prohibition on foreclosure referral in paragraph (f)(1) of this section. A small servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process and shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, if a borrower is performing pursuant to the terms of an agreement on a loss mitigation option.

**(k)** *Servicing transfers*—(1) *In general*—(i) *Timing of compliance.* Except as provided in paragraphs (k)(2) through (4) of this section, if a transferee servicer acquires the servicing of a mortgage loan for which a loss mitigation application is pending as of the transfer date, the transferee servicer must comply with the requirements of this section for that loss mitigation application within the timeframes that were applicable to the transferor servicer based on the date the transferor servicer received the loss mitigation application. All rights and protections under paragraphs (c) through (h) of this section to which a borrower was entitled before a transfer continue to apply notwithstanding the transfer.

**(ii)** *Transfer date defined.* For purposes of this paragraph (k), the transfer date is the date on which the transferee servicer will begin accepting payments relating to the mortgage loan, as disclosed on the notice of transfer of loan servicing pursuant to § 1024.33(b)(4)(iv).

**(2)** *Acknowledgment notices*—(i) *Transferee servicer timeframes.* If a transferee servicer acquires the servicing of a mortgage loan for which the period to provide the notice required by paragraph (b)(2)(i)(B) of this section has not expired as of the transfer date and the transferor servicer has not provided such notice, the transferee servicer must provide the notice within 10 days (excluding legal public holi days, Satur days, and Sun days) of the transfer date.

**(ii)** *Prohibitions.* A transferee servicer that must provide the notice required by paragraph (b)(2)(i)(B) of this section under this paragraph (k)(2):

**(A)** Shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process until a date that is after the reasonable date disclosed to the borrower pursuant to paragraph (b)(2)(ii) of this section, notwithstanding paragraph (f)(1) of this section. For purposes of paragraph (f)(2) of this section, a borrower who submits a complete loss mitigation application on or before the reasonable date disclosed to the borrower pursuant to paragraph (b)(2)(ii) of this section shall be treated as having done so during the pre-foreclosure review period set forth in paragraph (f)(1) of this section.

**(B)** Shall comply with paragraphs (c), (d), and (g) of this section if the borrower submits a complete loss mitigation application to the transferee or transferor servicer 37 or fewer days before the foreclosure sale but on or before the reasonable date disclosed to the borrower pursuant to paragraph (b)(2)(ii) of this section.

**(3)** *Complete loss mitigation applications pending at transfer.* If a transferee servicer acquires the servicing of a mortgage loan for which a complete loss mitigation application is pending as of the transfer date, the transferee servicer must comply with the applicable requirements of paragraphs (c)(1) and (4) of this section within 30 days of the transfer date.

**(4)** *Applications subject to appeal process.* If a transferee servicer acquires the servicing of a mortgage loan for which an appeal of a transferor servicer's determination pursuant to paragraph (h) of this section has not been resolved by the transferor servicer as of the transfer date or is timely filed after the transfer date, the transferee servicer must make a determination on the appeal if it is able to do so or, if it is unable to do so, must treat the appeal as a pending complete loss mitigation application.

**(i)** *Determining appeal.* If a transferee servicer is required under this paragraph (k)(4) to make a determination on an appeal, the transferee servicer must complete the determination and provide the notice required by paragraph (h)(4) of this section within 30 days of the transfer date or 30 days of the date the borrower made the appeal, whichever is later.

**(ii)** *Servicer unable to determine appeal.* A transferee servicer that is required to treat a borrower's appeal as a pending complete loss mitigation application under this paragraph (k)(4) must comply with the requirements of this section for such application, including evaluating the borrower for all loss mitigation options available to the borrower from the transferee servicer. For purposes of paragraph (c) or (k)(3) of this section, as applicable, such a pending complete loss mitigation application shall be considered complete as of the date the appeal was received by the transferor servicer or the transferee servicer, whichever occurs first. For purposes of paragraphs (e) through (h) of this section, the transferee servicer must treat such a pending complete loss mitigation application as facially complete under paragraph (c)(2)(iv) as of the date it was first facially complete or complete, as applicable, with respect to the transferor servicer.

**(5)** *Pending loss mitigation offers.* A transfer does not affect a borrower's ability to accept or reject a loss mitigation option offered under paragraph (c) or (h) of this section. If a transferee servicer acquires the servicing of a mortgage loan for which the borrower's time period under paragraph (e) or (h) of this section for accepting or rejecting a loss mitigation option offered by the transferor servicer has not expired as of the transfer date, the transferee servicer must allow the borrower to accept or reject the offer during the unexpired balance of the applicable time period.

48.    Plaintiff had obtained this Modification offer after a conference with

Rhode Island Housing,  in which  the mediation coordinator for Rhode

Island Housing negotiated this modification offer with PHH on behalf of the

Plaintiff.

49.    The Plaintiff accepted the modification offer, in which PHH  stated:

The account is approved for an PHH Mortgage Services Streamline
Modification with monthly payments in the amount of $1233.42
In order to have the account modified permanently the following
requirements must be met:
Successful completion of the Trial Period Plan,. The Trial Period Plan. The
Trial offer details are enclosed. Please read all materials carefully
Property title must be clear of liens, judgments and other encumbrances
Upon successful completion of the Trial Period Plan, we will send a
Permanent Modification Agreement, which will require all parties who
appear on the original Note or who appear on the Title to sign. It may be
necessary to sign the Agreement in the presence of a notary public. . . .
If we are contacted and the offer is accepted, but there is subsequent failure
to make the first Trial Period Plan payment by the first payment due date,
and we do not receive the payment by the last due of the month in which it is
due, the offer will be revoked and foreclosure proceedings may continue and
foreclosure sale may occur.


Plaintiff did not receive any other conditions for this modification when she

commenced making payments on the modification.


## COUNT I

BREACH OF CONTRACT AND BREACH OF THE COVENANT OF
GOOD FAITH AND DEALING FOR SEEKING TO EXERCISE THE
STATUTORY POWER OF SALE WITHOUT CONTRACTUAL OR
STATUTORY AUTHORITY

50.    Paragraphs 1-49 are incorporated by reference.

51.    The failure of US Bank to strictly comply with  R.I.G.L.34-27-3.1 and

the terms of the note and mortgage   renders void any attempt to commence

the alleged foreclosure by Statutory Power of Sale, without having the

contractual or statutory ability to exercise the statutory power of sale.

52.     As a result of this failure to strictly comply with the terms of the mortgage, US Bank, though PHH  could not exercise the statutory power of sale.

53.     PHH was loan servicer and agent for US Bank.

54.     The modification offer was accepted by the Plaintiff and Albert Aglione.

55.     The Plaintiff complied with all the terms of the modification and made the first two payments on the modification.

56.     Pursuant to the terms of the mortgage and the statutory scheme, US Bank, through PHH was not contractually authorized to exercise the statutory power of sale and foreclose on the Plaintiffs' property until it complied with the mortgage and the statute.

57.     The loan modification offer accepted by the Plaintiff and Albert Aglione with two payments made by Plaintiff created a contract with PHH on behalf of US Bank.

58.     PHH on behalf of US Bank was obligated not to advertise the sale any further once the offer was accepted and once each payment was made.

59.     US Bank through its agent and servicer, refused to accept the Plaintiff's third trial modification payment, claiming instead that the loan was in foreclosure.

60.     However the contractual obligation of US Bank, created by its agent PHH precluded any advertising of foreclosure sale after the offer was accepted and the first trial payment was made.

61.     The actions of US Bank, acting through PHH and its agent Orlans in continuing to advertise the sale, and refusing to cancel the sale scheduled for October 18, 2023 constituted a breach of contract, resulting in damages to the Plaintiff, who hired an attorney to commence this case.

62.     Plaintiff's mortgage loan account has been charged unreasonable fees and expenses for the advertising of this foreclosure taking away from the significant equity in Plaintiff's home.

63.     The refusal to  accept the third trial payment and to continue to proceed to sale did not comply with 12 C.F.R. 1024.41 as Plaintiff was never notified that the unconditional  modification offer had been withdrawn for any reason.

64.     Pursuant to 12 CFR 1024.41 any denial of a modification offer requires a right to appeal the denial.

65.     Plaintiff was never provided notice that she had a right to appeal any withdrawal of the unconditional loan modification.

66.     Albert Aglione accepted the loan modification and was willing to sign any documents for the modification .

67.    As a result of the conduct of US Bank through PHH she has suffered emotional damages for embarrassment and humiliation by the advertising of several foreclosures of her home.

68.    The actions of US Bank, through PHH, violated the covenant of good faith and dealing.

69.    The conduct of the Defendant in not complying with the terms of the mortgage and offered loan modification was willful, wanton and reckless, warranting the imposition of punitive damages.

70.    Plaintiff has incurred legal fees for the defense of this improper foreclosure and for the prosecution of this action.

71.    The Defendant has not engaged in good faith and dealing with the Plaintiffs contrary to the terms of the mortgage contract and the statutory scheme of Rhode Island law by scheduling this sale.

72.    US Bank cannot enforce this mortgage because it has not been assigned the mortgage.

73.    Exhibit I attached to this complaint is a certified copy of a US Bankruptcy Court record for the Eastern District of Louisiana.

74.    In this affidavit, Dale Sugimoto the President of Sand Canyon Corporation , f/k/a Option One Mortgage Corporation, the original

mortgagee, stated under oath and declared under the penalty of perjury on March 18, 2009:

Sand Canyon also does not own any residential real estate mortgages.

75.    Exhibit C, the purported mortgage assignment, purported to assign the Plaintiff's mortgage from Sand Canyon Corporation, f/k/a Option One Mortgage Corporation to US Bank on September 6, 2012.

76.    Since Sand Canyon Corporation owned no mortgage loans on that date, this assignment was void.

77.    The Rhode Island Supreme Court in *Mruk v. Mortgage Electronic Registration Systems, Inc.* 82 A.3d 527 (2013) has held that a mortgage assignment is void if the assignor does not have a mortgage to assign and cannot transfer title on the date of the assignment.

78.    This Court has also concluded in *Mruk* that Rhode Island law also provided the same protections to mortgagors and held that mortgagors have standing to challenge "'invalid, ineffective, or void' assignments, such as situations where `the assignor had nothing to assign or had no authority to make an assignment to a particular assignee.'" *Cosajay v. Mortgage Electronic Registration Systems, Inc.,* 980 F. Supp. 2d 238 (D.R.I.,2013) (quoting *Culhane v. Aurora Loan Services of Nebraska,* 708 F.3d 282, 291 (1st Cir.2013).

79.    US Bank lacks title to the mortgage and thus cannot foreclose on the Plaintiff's property.

WHEREFORE, Plaintiffs demand the following relief:

      a.    Actual damages against  US Bank for failure to comply with the terms of the mortgage, contract for modification and note and the statutory scheme and for legal fees and actual damages arising from the breach of contract and for failure to comply with the terms of the mortgage  and R.I.G.L 34-27-4, and R.I.G.L 34-27-3.1.

      b.    legal fees pursuant to Rhode Island law.

      c.    All other just and proper relief.

TERESA TAMELLEO

By her Attorney

October 17, 2023

/s/ John B. Ennis
JOHN B. ENNIS, ESQ. #2135
1200 Reservoir Avenue
Cranston, Rhode Island 02920
(401) 943-9230
Jbelaw75@gmail.com

## COUNT II

## INJUNCTIVE RELIEF

80.    Paragraphs 1-79 are incorporated by reference.

81.     Plaintiff will be irreparably harmed if the foreclosure sale that is scheduled for October 18, 2023 occurs and causes the sale of her home without compliance with the terms of the note, mortgage and R.I.G.L. 34-27-3.1. and without being the owner of the mortgage, not having been assigned the mortgage

82.     Plaintiff has a substantial likelihood of success in the pending action, would otherwise suffer irreparable harm and can claim the greater hardship in the absence of an order, which will not disserve the public interest if imposed.

84.     These facts demonstrate that Plaintiff has a substantial likelihood of success.

85.     The Plaintiff complied with all the terms of the unconditional loan modification and made payments for the first two months.

86.     She did not receive a proper notice of denial of the modification pursuant to RESPA and was never given any opportunity to appeal any denial pursuant to RESPA.

87.     US Bank and PHH should be equitably estopped from refusing to accept the third modification payment.

88.     Plaintiff relied on the offer of the loan modification, made payments and US Bank through PHH refused to accept the third payment despite the

unconditional offer conveyed to the Plaintiff by the letter dated July 3, 2023 and accepted on July 26, 2023 with two payments amounting to significant performance of all the terms of the modification. In its February 16, 2023 periodic statement mailed to 9 Lee Ann Drive, Johnston, PHH, falsely stated that there were assessed expenses on the mortgage loan account in the amount of $2,029.40 for a previous foreclosure attempt after October 2022.

89.    In its September  16, 2023 in the  periodic statement mailed to 9 Lee Ann Drive, Johnston, ("Exhibit J") PHH, falsely stated that there were assessed expenses on the mortgage loan account in the amount of $7,148.46 for a previous foreclosure attempt and the foreclosure advertisements and legal fees incurred in this matter.

90.    The  September 16, 2023 periodic statement indicates that the Plaintiff's loan was not accelerated due to the fact that  loan was being modified.

91.    The provisions of the Regulation Z of  the Truth in Lending Act, 12 C.F.R. 1026.41 specifically provide that certain notices be provided to homeowners more than 45 days in default:

**(8) Delinquency information.** If the consumer is more than 45 days delinquent, the following items, grouped together in close proximity to each other and located on the first page of the statement or, alternatively, on a separate page enclosed with the periodic statement or in a separate letter:

**(i)** The length of the consumer's delinquency;

**(ii)** A notification of possible risks, such as foreclosure, and expenses, that may be incurred if the delinquency is not cured;

**(iii)** An account history showing, for the previous six months or the period since the last time the account was current, whichever is shorter, the amount remaining past due from each billing cycle or, if any such payment was fully paid, the date on which it was credited as fully paid;

**(iv)** A notice indicating any loss mitigation program to which the consumer has agreed, if applicable;

**(v)** A notice of whether the servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, if applicable;

**(vi)** The total payment amount needed to bring the account current; and

**(vii)** A reference to the homeownership counselor information disclosed pursuant to paragraph (d)(7)(v) of this section.

92.    PHH  indicated in this periodic  statement that:

If you have been approved for a loss mitigation workout program. Please refer to you agreement for payment details.

However in this statement PHH also did not provide to the Plaintiff the

following information as required by  Regulation Z:

**(i)** The length of the consumer's delinquency;

**(ii)** A notification of possible risks, such as foreclosure, and expenses, that may be incurred if the delinquency is not cured;

**(iv)** A notice indicating any loss mitigation program to which the consumer has agreed, if applicable;

**(v)** A notice of whether the servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, if applicable;

**(vii)** A reference to the homeownership counselor information disclosed pursuant to paragraph (d)(7)(v) of this section.

93.    Thus as of September 18, 2018 PHH had not indicated that the mortgage loan had been accelerated and did not indicate that the first notice required for a non-judicial foreclosure,  It did not charge her late fees for August and September 2023 because she made the timely trial payments. Plaintiff relied on the reference to the Loan Modification contractual promise that  no sale would occur because she had made her first two payments.

94.     A  foreclosure of her  property by a party not entitled to foreclose on the property will cause her irreparable harm, which hardship is greater than any hardship, which may be claimed by defendants. Such relief sought by her will not disserve the public interest if imposed.

95.    This property is her home where she resides with her husband.

96.    This property has at least $200,000.00 of equity as the assessed value is significantly greater than the amount due on the mortgage of approximately $204,000 as of this date.

WHEREFORE, Plaintiff demands that this Court:

a.    Grant a  Preliminary Injunction and Permanent Injunction Restraining and Enjoining Defendants and any other entity acting on their behalf from taking any action to conduct a foreclosure sale on October 18, 2023 at 9 Lee Ann Drive Johnston, Rhode Island from advertising  a

foreclosure sale or adjourning or continuing a sale  until further order of this

Court

      b.    Grant all other just and proper relief.

                                    TERESA TAMELLEO
                                    f/k/aTERESA AGLIONE
                                    By her Attorney

October 17, 2023                     /s/ John B. Ennis
                                    JOHN B. ENNIS, ESQ. #2135
                                    1200 Reservoir Avenue
                                    Cranston, Rhode Island 02920
                                    (401) 943-9230
                                    jbelaw75@gmail.com

## COUNT III

## VIOLATION OF THE RHODE ISLAND FAIR DEBT COLLECTION PRACTICES ACT

97.    Paragraphs 1-90 are incorporated by reference.

98.    At the time that PHH, through its predecessor before merger, Ocwen

obtained servicing rights of the Plaintiff's mortgage, it claimed that the

obligation of the Plaintiff was in default.

99.    Defendant, PHH is a "debt collector" as defined by the provisions of

R.I.G.L. § 19-14.9-3 ("RIFDCPA").

100.  Defendant, PHH is a loan  servicer and debt collector, whose principal

business is not the enforcement of security interests.

101.   PHH's primary business is to mail bills and notices to borrowers and to collect payments from mortgagors to collect  debts for mortgagees and also to provide loss mitigation to borrowers

102.   This Court has jurisdiction pursuant to the provisions of R.I.G.L. § 19-14.9-13.

103.   PHH since  October 16, 2022 has committed several violations of the RIFDCPA and is liable to the Plaintiff or compensatory damages, statutory damages, and attorney fees and costs for violations.

104.   PHH has used multiple unfair and unconscionable means to collect or attempt to collect a debt against the Plaintiff.

105   PHH has violated the RIFDCPA by using false deceptive and misleading representations or means in connection with the collection of this alleged debt.

106.   Specifically it stated that US Bank could exercise the statutory power of sale on June 20, 2023 and October 18, 2023 even though the terms of the contractual obligation to modify the mortgage was not complied with and due to the fact that US Bank had never been assigned the mortgage.

107.   PHH made false representations regarding the character, amount and legal status of the debt.

108.   PHH retained Orlans to collect an alleged debt allegedly due to the entity on whose behalf PHH was collecting by seeking to foreclose on Plaintiff's property.

109.   Orlans was acting as agent for US bank and PHH at all times in its communications with the Plaintiffs.

110.   PHH claiming to act on behalf of the owner of the mortgage loan, through its attorney, also violated the provisions of R.I.G.L. §19-14.9-7 (b)(e) by threatening to take an action that could not be legally taken, namely that it could exercise the statutory power of sale and conduct a foreclosure sale of the Plaintiff's home .

111.   PHH also violated  R.I.G.L. §19-14.9-8,  by:

f) Taking, or threatening to take, any nonjudicial action to effect dispossession or disablement of property because:

(1) There is no present right to possession of the property claimed as collateral through an enforceable security interest;

(2) There is no present intention to take possession of the property;

(3) The property is exempt by law from such dispossession or disablement;

106.   These actions to foreclose violated this statute due to the fact that US Bank did not comply with the terms of contractual modification it provided to the Plaintiff and due to the fact that id was never assigned the mortgage as referenced by the affidavit of Dale Sugimoto, the President of Sand Canyon Corporation.

107.   Thus the property was exempt from dispossession and there is no present right to possession of the property.

108.   After October 17, 2022 PHH claiming to be acting on behalf of the owner of the mortgage loan, through its attorney, made  false statements that it had had to right to foreclose by sale under power of sale contained in the mortgager for the failure to pay the principal and interest due under the Promissory Note, payment of which was a condition of the mortgage.

109.   US Bank  could not take this action for the reasons alleged in this complaint.

110.   Each action of PHH described above constitutes a separate violation of the RIFDCPA for which PHH is liable.

111.   All the actions alleged in this complaint were designed to compel the Plaintiff to pay monies to PHH through its attorney, on behalf of the alleged owner of the note and mortgage under the false threat of foreclosure of their

home unless she made such a payment to PHH through its attorney on behalf of  the entity, which claimed to own the note.

112.   The Plaintiff has incurred  actual damages as a result of the violations of the RIFDCPA:

a.      Plaintiff's mortgage loan account has been charged legal fees and expenses along with the costs of Providence Journal Advertisements, which have decreased the Plaintiff's equity in her home.

b.      She has suffered emotional damages for embarrassment and humiliation by the advertising of a foreclosure of her home despite entering into a contract with PHH to modify her loan.

c.      She has suffered emotional distress due to these actions and as a result of these actions she has incurred damages of mind and body.

d.      She has lost sleep worrying about the loss of her home due to these actions of PHH.

e.      She has taken time away from their usual activities worrying about the actions of PHH and to call and visit her attorney.

113.   As a result of the above described acts of PHH, this loan servicer is liable to the Plaintiff for actual damages, statutory damages, attorney's fees and costs.

WHEREFORE, Plaintiffs demand that Judgment be entered against

the Defendant PHH for the following relief:

A.    Judgment against PHH for actual damages, and statutory damages of $1,000.00 for each violation of the RIFDCPA.

B.    Judgment against PHH for legal fees and costs for the prosecution of this action.

C.    All other just and proper relief.

TERESA TAMELLEO
F/K/A TERESA AGLIONE
By her attorney,

October 17, 2023                    /s/ John B. Ennis
JOHN B. ENNIS, ESQ. #2135
1200 Reservoir Avenue
Cranston, Rhode Island 02920
(401) 943-9230
Jbelaw75@gmail.com

## COUNT V

## VIOLATIONS OF RESPA, 12 C.F.R. § 1024.41(b) AND 12 U.S.C. § 2605

114.   Plaintiff restates the allegations of paragraphs 1-113.

115 In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

116. Specifically, on January 17, 2013, the CFPB issued the Real Estate Settlement Procedures Act Mortgage Servicing Final Rules, 78 Fed. Reg.

10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

117. Plaintiffs assert claims for relief against PHH for Violations of the specific rules under RESPA and Regulation X, as set forth,

118. Shellpoint is a mortgage servicer as defined by RESPA and Regulation X. 12 U.S.C. § 2605(i)(2); 12 C.F.R. § 1024.2(b).

118. The Loan is a "federally related mortgage loan" as defined by RESPA and Regulation X. 12 U.S.C. § 2602(1); 12 C.F.R. § 1024.2(b).

119. The Loan is not a "reverse mortgage transaction" as defined by RESPA and Regulation X. 12 C.F.R. § 1024.31; see 12 C.F.R. § 1026.33(a) (Regulation Z).

120. The Loan is secured by the home which is Plaintiff's principal residence. 12 C.F.R. § 1024.30(c)(2).

121. PHH is subject to the requirements of RESPA and Regulation X, and does not qualify for the exception for "small servicers"-as defined by 12 C.F.R. §1026.41(e)(4)-nor for the exemption for a "qualified lender"-as defined by 12 C.F.R. § 617.7000.

122. Mortgage servicers are prohibited from failing "to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding

foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

123. Mortgage servicers are prohibited from failing "to comply with any other obligation found by the CFPB, by regulation, to be appropriate to carry out the consumer protection purposes of [RESPA]." 12 U.S.C. § 2605(k)(1)(E).

124.   PHH  has certified that Plaintiff is the confirmed successor in interest to co-mortgagor and borrower, Albert Aglione.

125. Plaintiff has private right action under RESPA and Regulation X pursuant to 12 U.S.C. § 2605(f) for the claimed Violations and such action provides for remedies including actual damages, statutory damages, and attorneys' fees and costs.

126.   As alleged above, Plaintiff was provided an unconditional streamlined loan modification on July 3, 2023, which was accepted on July 26, 2023.

127.   As successor in interest, Plaintiff was entitled to the same protections and rights as Albert Aglione, her co-mortgagor and borrower.

128.   PHH violated 12 CFR 1024.41 by running foreclosure advertisements in the Providence Journal while the Plaintiff was making her first two trial payments on the modification.

129.   This dual tracking is prohibited by Regulation X and 12 CFR 1024.41 Foreclosure case.

130.   PHH's failure to comply with 12 CFR 1024.41 caused Plaintiff to suffer from actual and proximate damages including, but not limited to:

a. Improper fees and charges imposed on the Loan, the collection of such fees, including any late fees and other default servicing related fees for which Plaintiff is personally obligated or which otherwise negatively impacts any equity in the Home to which she is entitled, and refusal to refund the full amount of the improperly collected fees and charges

b.     The Plaintiff has incurred emotional damages worrying about the possibility of losing her home despite a loan modification contract with PHH with a  justified fear that such  blatant indifference would result in sale of her property, which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress.

PATTERN AND PRACTICE OF PHH'S VIOLATIONS OF RESPA AND REGULATION X

131. PHH's actions are part of a pattern and practice of behavior in violation of  Plaintiff's rights and in abdication and contravention of PHH's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

132. PHH has numerous consumer complaints lodged against it nationally on the CFPB's consumer complaint database. Each such complaint is filed

and cataloged in the CFPB's publicly accessible online database which can be accessed at the following link:

https://WWW.consumerfinance.gov/data-research/consumer-complaints/search/?chartType=line&dateInterval=Month&dateRange=3y&date_receivedmax=2022-12-26&datereceivedmin=20 1 9-12-26&1ens=Product&searchFie1d=a11&subLens=sub_product&tab=Trends4

133.    Plaintiff has reviewed the CFPB's consumer complaint database and have identified narratives asserting that PHH engaged in similar conduct against other borrowers.

134. In particular, Plaintiff has reviewed the seven  (7) consumer complaints attached hereto and identified as Group Exhibit K.

135. The date, details, and a narrative disclosed by the consumer is set forth in each complaint.

136. The complaints show conduct which demonstrates that PHH has engaged in a pattern or practice of violating RESPA with respect to other borrowers.

137.  12 C.F.R. § 1024.41(a) provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f))."

138. As a result of PHH's actions, PHH  is liable to Plaintiff for actual damages and statutory damages. 12 U.S.C. § 2605(f)(1).

139. Additionally, Plaintiff requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

WHEREFORE Plaintiff respectfully request

that this Court enter an Order granting judgment against PHH Mortgage Corporation as follows:

A. Actual damages in an amount to be determined at trial for the allegations contained in this count.

B. Statutory damages of Two Thousand Dollars ($2,000.00) per borrower per violation of RESPA contained in this Count;

C. Costs and reasonable attorneys' fees as to this Count; and,

D.  Such other relief which this Court may deem appropriate.

TERESA TAMELLEO
F/K/A TERESA AGLIONE
By her attorney,

October 17, 2023                    /s/ John B. Ennis
                                    JOHN B. ENNIS, ESQ. #2135
                                    1200 Reservoir Avenue
                                    Cranston, Rhode Island 02920
                                    (401) 943-9230
                                    Jbelaw75@gmail.com

Plaintiff demands a Trial by Jury